Opinion issued March 12, 2019



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00240-CR

———————————

**VANESSA IVANOVA SADA, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

On Appeal from the 230th District Court
Harris County, Texas
Trial Court Case No. 1518516

## O P I N I O N

A jury convicted appellant, Vanessa Ivanova Sada, of causing serious bodily injury to her child, Jack,[1] by omission and assessed her punishment at twenty

---

[1] Jack is a pseudonym for J.G., the complainant in this case. We will use pseudonyms for all minor children in the case to protect their identities and for ease of referring to them.

years' confinement.[2]   In two points of error, appellant contends that: (1) the evidence is legally insufficient to support her conviction; and (2) the trial court erred in submitting an instruction on the law of parties to the jury.

We affirm.

## Background

Appellant is the biological mother of six children. The four oldest, Angel, Bella, Ariel, and Jack, were fathered by Jose Garcia. However, after having Jack, appellant and Garcia broke up, and appellant began a relationship with Javier Torres.  Appellant and Torres have two children together, Sara and Faith, who was born after these legal proceedings had begun.

Law enforcement's involvement with appellant and her family began on November 20, 2015.  Lavonda Foreman, a caseworker with the Department of Family and Protective Services (DFPS), received a referral after Bella appeared at school with a black eye.  As part of her investigation, Foreman arranged with appellant to visit the home.  Upon her arrival on November 20, 2015, Foreman noticed that the home appeared relatively clean and that the kitchen was well-stocked with food. She testified that Ariel, who was four years old at that time, appeared to be wearing several layers of clothing. Foreman stated that this was "odd" because she believed Ariel was wearing more clothing than was necessary

---

[2]      *See* TEX. PENAL CODE ANN. § 22.04.

given that the weather was not very cold. Following DFPS protocol, Foreman asked permission to check over Ariel without the layers of clothing, and appellant agreed. Once she had removed the clothing, Foreman noticed that Ariel "appeared to be very thin. Her bones were protruding from the torso area. Her legs were very thin. Her kneecaps were kind of rubbing together. Her pelvic bones were protruding as well. So, she appeared very, very thin."

Foreman continued her investigation by asking to see the other children in the home and by asking questions regarding their health and nutrition. Appellant told her that the children ate "all the time" and that they had recently been to the pediatrician, who recommended that they drink PediaSure. Appellant did not appear concerned regarding Ariel's condition. Appellant then led Foreman to the bedroom where Jack was waiting. Foreman noticed that Jack, who was nearly three years old at the time, was "in a fetal position, just balled up laying in the playpen in the corner." Foreman further testified that Jack made a sound "as if he were in pain, like a grunting noise" when appellant moved him, and he did not straighten his legs or hold his own head up. Foreman testified:

> [Jack] appeared to be a little discolored. He had a rash on his abdomen. [Jack] also had some—some bruising or like some rash, like a burn mark look on his forehead. [Jack] was also very, very underweight, very thin. And he wouldn't stretch out—like any other two-year-old I've seen, he wouldn't stretch his arms or legs out.

3

Foreman was concerned about the children's condition, so she contacted her supervisor, who instructed her to escort appellant and the children to the hospital.

Deputy D. Wareham with the Harris County Sheriff's Office testified that he was called to investigate an alleged injury to a child at a local hospital. When he arrived, he first saw Ariel and Jack in the emergency department. He stated that his initial observation upon seeing the children was "shock":

> The younger—the male, the younger one, obviously very underweight. Sores all over his face. Along with the little girl, was also—I was in shock looking at her because she was obviously underweight. You could see skeletal bone structure in her face.

Wareham testified that Jack kept his legs tucked up to his chest and could not hold up his own head. Wareham stayed with the children for security purposes while there were transported to Texas Children's Hospital. He contacted the officials who would conduct the investigation and then returned to his normal duties and was not involved in the subsequent investigation of the case.

Ultimately, Ariel and Jack stayed in the hospital for more than a month before they were placed with a foster family. Appellant's other children were also placed with foster families.

Appellant was eventually charged with "unlawfully while having a statutory duty to act pursuant to [Jack], intentionally and knowingly by omission caus[ing] SERIOUS BODILY INJURY to [Jack], hereafter styled the Complainant, a child younger than fifteen years of age, by FAILING TO PROVIDE ADEQUATE

4

NUTRITION" and by "FAILING TO PROVIDE ADEQUATE MEDICAL CARE."

At appellant's trial, both Foreman and Deputy Wareham testified regarding their interactions with the family, as set out above. Clemmy Eneas-Varence, a DFPS investigator, also testified regarding her investigation into the case. She stated that she first contacted appellant, Ariel, and Jack at Texas Children's. Appellant told Eneas-Varence that she was the children's primary caregiver and that she was in a "common-law relationship" with Javier Torres. Appellant told Eneas-Varence that she did not understand why Ariel and Jack were underweight because she provided medical care and would give them PediaSure. However, she did not seem concerned about what the children were experiencing at the hospital.

Dr. Lora Torres, a pediatrician who had examined appellant's children, testified that she saw Jack on one occasion, on November 25, 2014, just before his second birthday. He had a fever and was diagnosed with the flu. Dr. Torres also testified that he was otherwise healthy and no dietary concerns were raised during the appointment. At that time, his weight was in the 20th percentile for children his age, and his height was below the fifth percentile. Dr. Torres also saw Ariel on two occasions—once for a well-child check, in which she treated Ariel for pinworms but otherwise determined that Ariel was healthy, and once for concerns regarding significant weight loss. Dr. Torres did testing to seek a reason for

5

Ariel's significant weight loss, but all of her tests were normal. Appellant did not come back for any follow-up appointments with Ariel. Dr. Torres also saw Sara—appellant's child with Javier Torres—seven times over a nine-month period for well-child and sick visits.

Dr. Dorothy Lemacha, an ER physician at the hospital where Ariel and Jack were first taken on November 20, 2015, testified that the children were bought to her for an evaluation at the recommendation of DFPS based on concerns for their "overall physical condition." She testified that when she first saw Ariel and Jack, they looked unwell, "weak," and "somewhat dehydrated." The children were "very thin. Thinner than you would like to see children at this age." Upon examining the children, Dr. Lemacha became concerned that Ariel was very weak and could not walk properly, which was abnormal for a four-year-old child.

Dr. Lemacha also described Jack's condition:

> For a two-year-old, he didn't do anything. All he did was lay in the bed. He was limp. He whimpered and cried. He had sores all over his body. His legs were pulled up close to his body. I want to say contracted, kind of gives you a good idea, that he pulled his knees up to his chest. And that's how he laid. That was his most comfortable position. And he did lean to one side. When I tried to sit him up, he could not sit up on his own. As a two-year-old, that was concerning for me.

Dr. Lemacha tested for metabolic abnormalities, parasites, and other potential causes for the weight loss and weakness. The tests were normal, but Dr. Lemacha remained concerned that the children were in serious danger because

6

"[t]hey were not progressing appropriately for children of their age. They were very weak. They were very thin. There was something about this picture that was not right." Dr. Lemacha testified that she decided that the children needed a higher level of care and referred them to Texas Children's Hospital.

Dr. Lemacha further testified that she spoke to appellant to get a medical history for the children. She stated that appellant was "very focused on the parasites . . . and the history of worms." Appellant told Dr. Lemacha that Jack had been losing weight for the past month and that he had very sensitive skin, explaining that the sores on his skin might have been caused by lotions with perfumes or fragrances. Appellant also told Dr. Lemacha that Jack ate well and received PediaSure.

Deputy M. Fairley testified that he was dispatched to Texas Children's Hospital to investigate reports of two severely malnourished children. Deputy Fairley testified that he interacted with the children and with appellant. Fairley testified that appellant represented that she was the children's biological mother, and she told him that she was feeding them three meals a day and giving them PediaSure. Deputy Fairley learned that appellant and the children lived in the same home with Javier Torres, whom he identified as appellant's boyfriend. During his investigation, Fairley discovered that appellant was the primary caregiver for the children during the daytime and that Torres "would watch the

7

children when she was not there," including when appellant worked as a janitor on the night shift.

Appellant's oldest daughter, Angel, testified that appellant was her biological mom and that she had five siblings. Angel, who was in fourth grade at the time she testified, stated that prior to DFPS's involvement with her family, she lived in an apartment "[s]ometimes [with] [appellant] or [appellant] and Javier or just me and my siblings." When asked how often the children had a meal at the apartment, she answered, "Not that often," stating that the children ate "[w]hen [appellant] and Javier decided we should eat." She testified that she ate two meals a day at school, but Ariel and Jack were at the apartment while she was at school. Angel testified that there was food in the house, but Ariel and Jack did not get fed that often, stating, "[Jack] didn't get a lot, but [Ariel] sometimes would eat with us. But I did not know why." Angel testified that she tried to sneak food to her younger siblings.

Angel also stated that Jack was kept in a crib in the bedroom and he did not get to come out very often. She testified that she was only allowed to leave the room when she went to school or when appellant and Torres said it was okay to leave the bedroom. Angel remembered on one occasion that Jack began to look sick and appellant wanted to take him to the hospital, "but Javier said no." She

8

stated that appellant and Torres twice got into a fight and that Torres threatened appellant.

Bella, appellant's second-oldest daughter who was in third grade at the time of trial, testified as well. Bella likewise testified that appellant was her mother and that prior to DFPS's involvement with her family, she lived in an apartment with appellant, her "stepdad Javier," and her other siblings, including Angel, Ariel, and Jack. Bella also testified that she ate two meals at school—breakfast and lunch— but that it was "a rare thing" for her to eat a meal at her home. When asked how often Ariel and Jack ate food at the apartment, she answered, "Whenever we would get them food or sneak food." She also testified that Jack was never taken out of his crib. She testified that she was scared of Torres and that he was "mean."

Ariel and Jack's foster mother testified that she had been caring for both children since their release from the hospital in December 2015. In the two years she had cared for them, she did not have any problems with either child keeping weight on or refusing any kind of food. When Jack first came to her home, he had just turned three, but appeared "more like a 12 to 18 month old." He was "very tiny" and "could not stand without being assisted." Jack was also "very anxious about food" and "would carry around two cups at all times, even when he was not eating."

Dr. Lauren Krenek testified that she saw Ariel and Jack at Texas Children's Hospital. She testified that Jack was "severely malnourished," showing signs of muscle wasting, loss of protective fat, and swelling caused by lack of protein. He also demonstrated a "severe development delay" because he could not walk, run, or play like an almost-three-year old should be able to do. Dr. Krenek testified that appellant told her Jack had been eating normally and that he had just started losing weight within the last month, but Dr. Krenek testified that appellant's statements were inconsistent with her clinical observations. Dr. Krenek stated that Jack's condition was the result of "a chronic long-term process that could not have happened in one month." She further stated that, even if Jack's condition had been the result of some underlying medical condition, "he was in a medical emergency by the time he came in [to Texas Children's]. And he should have been brought to medical attention much sooner." She stated that both Ariel and Jack had passed the point where their malnutrition could have been treated by their general pediatrician and that they "needed to stay in the hospital because their weight loss was now an emergency." They were so malnourished that even just starting them on a prescribed diet could have been dangerous due to electrolyte imbalances and other complications involved in reintroducing food.

10

Dr. Marcella Donaruma, a doctor who consulted on Ariel's and Jack's care team at Texas Children's, testified that when she first saw Jack, she noted that he was "strikingly abnormal":

> He was emaciated. And he had a resting position where he would keep his feet curled up to the front of his chest as if he were used to be being permanently contained within a very small space. He had skin breakdown over parts of his face that point out, his nose, his forehead, the back of his head. He had some bed sores healing on the back of his spine. You could see his ribs. He had hanging skin. He looked strikingly malnourished and neglected.

Jack also had bruising and a broken rib, and he suffered from re-feeding syndrome, a complication that occurs when someone who was starved is fed again suddenly, which required treatment while he was in the emergency room. Dr. Donaruma testified that Jack's condition occurred "over a period of months," and there were numerous indicators that he needed urgent medical care:

> [Jack] was one month short of his third birthday . . . when he got to [the] emergency room [and] was unable to lift his head. [He] wasn't talking a month shy of his third birthday. [His] resting position, you saw, was compressed and beyond the fetal position. You could see his ribs. You could see where his eyes had sunken into his head. All of those things would indicate to a competent caretaker that medical intervention was warranted and had progressed to a state where I think his death was imminent had he not come to the hospital.

Dr. Donaruma did not find appellant's explanation that she had been feeding Jack three times a day and giving him PediaSure credible. She explained:

> [T]his child had been strung along being kept alive with an incredibl[y] small amount of energy to the point that he digested all of his own fat, a great deal of his own muscle to stay alive. And when we

11

got him, he was also dehydrated. It is not possible [that he was fed three times a day]. Because we did a work up to look for an underlying medical condition that could make him unable to use energy or to use energy more rapidly. It didn't exist. He simply wasn't fed. Because when we fed him, he grew.

Dr. Donaruma testified that the only explanation for Jack's condition was malnutrition.

Appellant testified on her own behalf. She stated that she had four children with her first partner, including Ariel and Jack. She later moved into an apartment with Javier Torres. Appellant testified that Torres rented the apartment, but she was on the lease as well. Each morning, she would wake up her school-aged children, and sometimes Torres also woke up the children. Once the children were dressed and ready, Torres's sister would take them to school. After school, appellant would help the children with their homework and projects, although sometimes she would also nap so that she could be prepared to work her night shift. She testified that she regularly prepared an evening meal for the family and that sometimes she would feed the children and sometimes she would leave the prepared food for Torres to feed the children. She testified that she would frequently see the dirty dishes when she got home from work and that the kids would tell her that they had eaten, but she also testified that she was not actually there to see whether they were being fed and did not know if Torres actually gave them the food.

Appellant also testified that she was afraid of Javier Torres. She stated that he made the rules of the house, and if she did not follow his rules, he would get mad and scream. She testified that she wanted to take the children to other doctors, but Torres would not let her and she did not have a car—he was the only one with a vehicle and he would not let her use it. Appellant also stated that Torres treated Sara, their child together, differently from her other children. He did not want her other children around Sara. Nevertheless, appellant testified that when she returned to work after having Sara, Torres was responsible for caring for all five children. She testified that she did not notice any serious changes in the children after she went back to work.

In response to the testimony of the medical professionals regarding Ariel's and Jack's medical condition, appellant testified that she "didn't think it was that serious, of how the doctors are saying it." She first became aware of the substantial risk to her children when they were transferred to Texas Children's. However, she testified that, after her children were hospitalized, she spent time thinking about what could have happened, stating:

> I was trying to do everything I could. I would leave food for them. I would give them food in the morning. But in the afternoon when I left to work, I wouldn't know if Mr. Torres would give them the food. In the morning, I see the dishes. I would ask my kids. And I would ask if their brother ate, if her sister ate. They will tell me yes as well.

Appellant acknowledged that she had the children stay in their room when Torres was home because she was trying to protect them, but she also testified that she would have them with her in the apartment when Torres was not there. Torres did not like for her to take Jack out of his crib. She testified that she was afraid of Torres and did not feel like she could leave him because he would become very angry. She testified that he was very controlling. Appellant did not realize how afraid of Torres her children were until they testified at trial.

Appellant further testified that she noticed Jack's weight loss a month or two before DFPS intervened and he was taken to the hospital. She wanted to take him to the doctor, but Torres would not allow it. Even though she wanted to take Jack for medical attention, she did not believe that he was facing a substantial risk of impairment or serious injury.

The jury charge instructed the jury that it could find appellant guilty as the primary actor or as a party to the actions of Javier Torres. Appellant objected to the latter portion of the charge:

> And one additional objection I have to the charge is the inclusion of what I'll call the law of parties instruction, which instructs the jury: If you find from the evidence beyond a reasonable doubt that on or about the 20th day of November 2015, in Harris County, Texas, Javier Torres, did then and there unlawfully, while having a statutory duty to act pursuant to [Jack]—and I'll stop right there. And through the rest of that paragraph is what my objection is to. Because there has [been] no evidence to establish that Javier Torres had any statutory duty [with] respect to [Jack]. So, I don't believe that there is anything

14

> that—in the evidence that would allow the Court to charge the jury on the law of parties concerning Javier Torres.

The State responded by pointing out appellant's testimony that she had prepared meals for the children and it was Torres who failed to feed them and that Torres had prevented her from taking the children for more regular healthcare. The State further argued that Torres had a biological child also living in the home, that there was at least some evidence of a common-law marriage between appellant and Torres, and that evidence at trial established that Torres bore some responsibility for caring for the children such as making decision about their healthcare and acting as the sole caregiver when appellant was working. The trial court overruled appellant's objection to the charge.

The jury found appellant guilty and assessed her punishment at confinement for twenty years. This appeal followed.

## Sufficiency of the Evidence

In her first issue, appellant argues that the evidence is legally insufficient to sustain her conviction because the State adduced no evidence that she had a statutory duty to provide food or medical care to Jack.

## A.    Standard of Review

In conducting a legal sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt.

15

*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Whatley v. State*, 445 S.W.3d 159, 166 (Tex. Crim. App. 2014). We defer to the factfinder to resolve conflicts, weigh the evidence, and draw reasonable inferences. *Whatley*, 445 S.W.3d at 166 ("This 'familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" (quoting *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789)). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *Id.*; *see Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007).

In our sufficiency review, "direct evidence of the elements of the offense is not required." *Hooper v. State*, 214 S.W.3d 9, 14–15 (Tex. Crim. App. 2007). Circumstantial evidence is as probative as direct evidence, and juries are permitted to make reasonable inferences from the evidence presented at trial and in establishing the defendant's guilt. *Id.* "Circumstantial evidence alone can be sufficient to establish guilt." *Id.* at 15. "[T]he lack of direct evidence is not dispositive of the issue of a defendant's guilt." *Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Thomas v. State*, 444 S.W.3d

16

4, 8 (Tex. Crim. App. 2014); *Winfrey v. State*, 393 S.W.3d 763, 768 (Tex. Crim. App. 2013).

We measure the sufficiency of the evidence against the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.* (quoting *Malik*, 953 S.W.2d at 240).

The Penal Code defines injury to a child as follows:

(a) A person commits an offense if he intentionally, knowingly, or recklessly, or with criminal negligence, by act or intentionally, knowingly, or recklessly by omission, causes a child, elderly individual, or disabled individual:

    (1) serious bodily injury;

    (2) serious mental deficiency, impairment, or injury; or

    (3) bodily injury.

. . . .

(b) An omission that causes a condition described by Subsection (a)(1), (2), or (3) . . . is conduct constituting an offense under this section if:

    (1) the actor has a legal or statutory duty to act; or

17

(2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual.

TEX. PENAL CODE ANN. § 22.04(a)–(b).

A parent has a statutory duty to care for, control, protect, and provide food and medical care for a child. TEX. FAM. CODE ANN. § 151.001(a)(2), (3) (providing that "[a] parent of a child has [enumerated] rights and duties" including "the duty of care, control, protection, and reasonable discipline of the child" and "the duty to support the child, including providing the child with clothing, food, shelter, medical and dental care, and education"); *Alameda v. State*, 181 S.W.3d 772, 779 (Tex. App.—Fort Worth 2005, no pet.) ("Parents have the statutory duty of care, control, and protection of their children"); *see also Chiplin v. State*, No. 05-17-01052-CR, 2018 WL 6583025, at *2 (Tex. App.—Dallas Dec. 14, 2018, no pet.) (mem. op., not designated for publication) (analyzing duty in context of section 22.04 and recognizing that "a parent has a statutory duty to care for, control, protect, and provide medical care for a child"); *Perez v. State*, No. 08-12-00340-CR, 2015 WL 4940375, at *6 (Tex. App.—El Paso Aug. 19, 2015, no pet.) (mem. op., not designated for publication) ("Pursuant to Section 151.001 of the Texas Family Code, a parent has the legal obligations, among others, to protect her children and to provide them with medical care.").

The Penal Code also defines when an actor has "assumed care, custody, or control" over a child for purposes of section 2.204: "[An] actor has assumed care,

18

custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care for a child. . . ." TEX. PENAL CODE ANN. § 22.04(d).

## B.     Analysis

Under the hypothetically correct jury charge for the offense as indicted here, the State was required to prove that appellant, while having a statutory duty to act on Jack's behalf, intentionally or knowingly by omission caused Jack serious bodily injury by failing to provide adequate nutrition or by failing to provide adequate medical care.     Appellant contends only that the State presented no evidence that she owed a statutory duty to Jack.

The State presented undisputed evidence that appellant was Jack's biological mother and that Jack resided with her. *See* TEX. FAM. CODE ANN. § 101.024(a) (providing that "'Parent' means the mother, a man presumed to be the father, . . . or an adoptive mother or father"); *see Whatley*, 445 S.W.3d at 166 (jurors may make reasonable inferences from evidence); *Acosta v. State*, 429 S.W.3d 621, 625 (Tex. Crim. App. 2014) ("[T]he trier of fact may use common sense and apply common knowledge, observation, and experience gained in ordinary affairs when drawing inferences from the evidence.").   As a matter of law, parents owe a statutory duty to their children. *See* TEX. FAM. CODE ANN. § 151.001(a)(2), (3); *Prescott v. State*,

123 S.W.3d 506, 512 (Tex. App.—San Antonio 2003, no pet.) (recognizing Family Code's statutory duty of parent to child and "uncontroverted testimony" showing that defendant was victim's parent; holding, "When the defendant is a parent of the victim, the parent's statutory duty satisfies the first prong of the test for liability for an omission [causing serious bodily injury]"). Thus, the evidence was legally sufficient to establish that appellant owed a statutory duty to care for Jack. *See* TEX. FAM. CODE ANN. § 151.001(a)(2), (3); *Prescott*, 123 S.W.3d at 512.

Appellant argues that the evidence was insufficient because the State failed to present evidence that she had a statutory duty to Jack. Appellant argues, "Although there is evidence in the record that [appellant] was [Jack's] biological mother, there is literally no evidence she had any statutory duties." This argument conflates legal principles and questions of fact. Appellant does not contend that the trial court erred in failing to properly advise the jury regarding the statutory duties of parents.[3] Rather, appellant raises a challenge to the legal sufficiency of the evidence.

The relevant fact question here is whether appellant was Jack's mother. As discussed above, there was undisputed evidence that appellant was Jack's mother

---

[3]   The record demonstrates that this issue was raised during voir dire, but it was not included in the jury charge. Nevertheless, we examine the sufficiency of the evidence under a hypothetically correct jury charge. *See Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *see also Prescott v. State*, 123 S.W.3d 506, 512 (Tex. App.—San Antonio 2003, no pet.) (discussing jury instruction regarding statutory duty of parent).

and that she was responsible for his day-to-day care prior to his hospitalization and placement in foster care. The legal effect of the fact that appellant was Jack's mother falls within the province of the trial court's obligation to instruct the jury on the law applicable to the case. *See Ouellette v. State*, 353 S.W.3d 868, 870 (Tex. Crim. App. 2011) ("Trial courts are obliged to instruct juries on 'the law applicable to the case,' which includes the statutory definitions that affect the meaning of the elements of the offense.") (quoting *Villarreal*, 286 S.W.3d at 329). By virtue of appellant's identity as Jack's mother, she owed him a statutory duty of care as a matter of law. *See* TEX. FAM. CODE ANN. §§ 101.024(a), 151.001(a)(2), (3). Thus, the State presented legally sufficient evidence on each element of the offense.

We overrule appellant's first point of error.

**Charge Error**

In her second point of error, appellant argues that the trial court erred in including an instruction allowing the jury to convict her as a party to the actions of Javier Torres. She argues that the charge erroneously "authorized the jury to convict [her] for the unlawful conduct of [Torres] when the evidence was legally insufficient to prove that [Torres] committed the alleged offense."

## A. Standard of Review

We review a claim of jury charge error in two steps. *See Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). First, we determine whether there is error in the charge. *Id.* Second, if there is error, we review the record to determine whether the error caused sufficient harm to require reversal. *Id.* The degree of harm necessary for reversal depends upon whether the error was preserved in the trial court. *See Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). An erroneous jury charge requires reversal when the defendant has properly objected to the charge—as occurred here—and we find "some harm" to his rights. *Almanza*, 686 S.W.2d at 171; *see also* TEX. CODE CRIM. PROC. ANN. art. 36.19 (providing that judgment shall not be reversed unless error appearing from record was calculated to injure rights of defendant or unless it appears from record that defendant has not had fair and impartial trial).

In assessing "some" harm under *Almanza*, we consider the error in light of four factors: (1) the entire jury charge, (2) the state of the evidence, (3) the jury arguments, and (4) any other relevant information as revealed by the record as a whole. 686 S.W.2d at 171; *see Elizondo v. State*, 487 S.W.3d 185, 205 (Tex. Crim. App. 2016). We must review the relevant portions of the entire record to determine

22

whether a defendant suffered actual harm, as opposed to theoretical harm, as a result of the error. *State v. Ambrose*, 487 S.W.3d 587, 598 (Tex. Crim. App. 2016).

## B.    Analysis

Appellant argues that Torres could not have been guilty as a primary actor because he did not owe a statutory duty to Jack and, thus, the trial court erred in allowing the jury to find her guilty as a party to Torres's omissions.  This argument ignores the language of Penal Code section 22.04, which provides that an omission causing serious bodily injury is "conduct constituting an offense" if "(1) the actor has a legal or statutory duty to act," *or* "(2) the actor has assumed care, custody, or control of a child, elderly individual, or disabled individual."  TEX. PENAL CODE ANN. § 22.04(b).  Thus, the "statute is phrased in the disjunctive: [an actor] is responsible if [he] has *either* assumed care, custody, or control *or* has a legal or statutory duty to act."  *Prescott*, 123 S.W.3d at 512 (emphasis in original); *see also Villareal*, 286 S.W.3d at 327 (we measure sufficiency of evidence under hypothetically correct jury charge); *Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000) (hypothetically correct jury charge should track statutory elements of offense).  The Penal Code further defines when an actor has "assumed care, custody or control" of a child: "[An] actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a

23

reasonable person to conclude that he has accepted responsibility for protection, food, shelter, and medical care of a child. . . ." TEX. PENAL CODE ANN. § 22.04(d).

The evidence here demonstrated that Torres lived in the home with appellant and her children, including Jack. When appellant was working, Torres was Jack's sole caregiver, and even on occasions when appellant was home, Torres provided supervision and other care to the children. Appellant, Angel, and Bella all testified that Torres made decisions regarding where the children slept, what they ate, and when they received medical care. Appellant testified that she prepared food for the children and left it for Torres to feed to the children. Thus, she indicated that, if Jack had been malnourished, it was Torres's fault for not giving him food or allowing him adequate medical care. This evidence is sufficient to establish that Torres engaged in acts and a course of conduct so as to cause a reasonable person to conclude that he had accepted responsibility for protection, food, shelter and medical care for Jack, and, thus, Torres could be liable for the injuries caused by his omissions. *See id.*

Furthermore, any error in the trial court's charge regarding appellant's liability as a party is harmless. The jury charge instructed the jury that it could find appellant guilty as the primary actor or as a party to Torres's actions. As set out above, the evidence presented at trial overwhelmingly supported a determination that appellant, as Jack's mother, failed to provide adequate nutrition and medical

24

care as the primary actor, causing Jack serious bodily injury. It was appellant's own testimony that deflected responsibility for Jack's condition onto Torres by claiming that he failed to give food to Jack and that he threatened appellant and forbid her from caring for her children. In light of these facts, any alleged harm appellant suffered from the trial court's charge permitting the jury to convict her as a party to Torres's actions is nothing more than theoretical. *See Ambrose*, 487 S.W.3d at 598; *Elizondo*, 487 S.W.3d at 205.

We overrule appellant's second point of error.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Landau.

Publish. TEX. R. APP. P. 47.2(b).